Filed 3/14/25  Chang v. Brooks CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| EDWARD CHANG,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANDREW BROOKS,<br>    Defendant and Appellant. | B320278 c/w B326700<br><br>(Los Angeles County<br>Super. Ct. No. 21STRO06855) |

APPEALS from orders of the Superior Court of Los Angeles County, Patricia A. Young and Michael J. Convey, Judges. Affirmed.

Law Offices of Ronald Richards & Associates, Ronald Neil Richards; Pierce & Shearer, Andrew F. Pierce and Adriana C. Moore for Defendant and Appellant.

Blank Rome and Cheryl S. Chang for Plaintiff and Respondent.

―――――――――――――

Defendant and appellant Andrew Brooks appeals from four trial court orders arising from a dispute with his former neighbor, plaintiff and respondent Edward Chang. Brooks challenges a civil harassment restraining order issued against him in favor of Chang pursuant to Code of Civil Procedure section 527.6.[1] He also asserts that the trial court erred by denying his request to terminate the restraining order based on changed circumstances. Brooks additionally challenges the trial court's order denying his special motion to strike pursuant to California's anti-SLAPP statute (§ 425.16) and awarding attorney fees and costs to Chang. We affirm the orders.

**FACTUAL AND PROCEDURAL BACKGROUND[2]**

The parties were neighbors in the gated community of Mulholland Estates, in Beverly Hills. Before the relevant incidents, they had never met.

Early on the morning of November 28, 2021, Ronald "Manny" Kigonya, the head of security at Mulholland Estates, informed Brooks that "something had happened" to his cat. Brooks found the cat's body on a fire road adjacent to Chang's

---

[1] All further undesignated statutory references are to the Code of Civil Procedure.

[2] Consistent with the substantial evidence standard of review, we recite the facts in the light most favorable to the trial court's orders and resolve any conflicts in the evidence in support of those orders. (*612 South LLC v. Laconic Limited Partnership* (2010) 184 Cal.App.4th 1270, 1276.)

2

property.  He quickly came to the conclusion that Chang had shot the cat with a pellet gun.[3]

Around 7:40 a.m., Brooks went to Chang's property and looked over his gate in an attempt to "see why [his] cat was found dead next to [Chang's] property."

Around 11:00 a.m., Brooks and two of his daughters went to Chang's house.  Chang and his wife, Margaret Chang, were leaving for a walk.[4]  In an interaction captured on video from two of Chang's security cameras, when the Changs opened their garage door, Brooks and his two daughters were already standing approximately six feet outside the door, approximately 20 to 30 feet away from Chang.

Chang had never seen them before.  He asked, "Who is that?"  Brooks responded, "I'm the owner of the cat you shot you fucker.  You are in trouble.  Big trouble.  Big trouble.  Big trouble. Jail.  Jail.  You fucking did it.  You're going to jail.  You will go to jail.  You will go to jail.  You will go to jail. . . . Jail for you.  Jail for you.  Can't wait."  Brooks and one daughter each said, "He shot our cat."  Chang responded, "No, No, No," when accused of killing the cat.

---

[3]     According to Brooks, he had heard that Chang had used a pellet gun to shoot a neighbor's cat.  Brooks also testified that Kigonya told him that his cat's death probably had something to do with Chang.  Kigonya had investigated a report by another neighbor that Chang or his son had shot a pellet gun at the community's tennis court area, and, according to Brooks, Kigonya reminded him of that investigation.  Kigonya submitted a declaration stating that the investigation did not uncover any evidence in support of the accusation against Chang and his son.

[4]     Because Edward and Margaret Chang share the same last name, we refer to Margaret Chang as Margaret for clarity.

Meanwhile, Brooks's unleashed dog ran towards Chang, but one of his daughters called it back. Another daughter restrained Brooks as he approached the garage while yelling at Chang. Brooks walked to the edge of the garage and appeared to take a photo or a video inside, at one point placing his arms under the closing garage door. One of his daughters prevented him from getting closer by wrapping her arms around him. Margaret closed the garage door and called 911.

Chang immediately went outside and walked to the edge of his driveway where Brooks and his daughters remained, just outside of Chang's fence. Chang intended to reason with Brooks and find out what happened. One of Brooks's daughters pointed to a bush adjacent to the fence on Chang's property and asserted, "Here is where you killed the cat, from right there. Our cat was killed right here. He was shot." Chang replied, "I call [*sic*] the police." Brooks ran towards Chang with his arms outstretched. He shouted, "You call the police. You call the police, you piece of shit. You call the police." Chang yelled that Brooks did not have evidence and asked why Brooks was accusing him. Brooks responded that he had evidence and that Chang was going to jail. When Chang asked Brooks to identify himself, Brooks said that he was "Bin Laden." He also said, "Never mind my name," but declared he knew Chang's name, and that Chang was 65 years old. Brooks said, "I know all about you. I know all about you," and, "You are a killer, a cat killer."

Chang's two adult sons came outside and asked why Brooks and his daughters were accusing Chang. During this interaction, Chang and Brooks were about six feet from each other. One of Brooks's daughters came within four or five feet of Chang. A

4

security guard came to talk to Brooks, and Brooks left with the guard.

During these confrontations, Brooks's daughter attempted to pull Brooks away from Chang. She described the situation as "rather tense on both sides," and her father's behavior of calling Chang a cat killer as unreasonable. On a video from the second interaction, she can be heard saying, "Please dad."

That night, Chang reviewed video footage from his home security system. A video from November 28 at 5:49 a.m. showed two coyotes attacking Brooks's cat. Chang did not immediately share this information with Brooks because his daughter had advised him not to disclose anything until they had more information.

The next day, November 29, at approximately 4:00 p.m., the parties encountered each other on the fire road adjacent to Chang's property. Shortly before, the Changs had seen Brooks and his daughter near their house looking in some shrubs. According to Brooks and his daughter, they had found a small plastic pellet in that area, which "reinforced" their belief that Chang had shot their cat. Brooks testified that he had x-rayed his cat and found what he believed was a fragment of a pellet, so he and his daughter went to the area near Chang's home to look for other pellets.[5]

---

[5] On November 29, 2021, Brooks also filed a report with the City of Los Angeles Department of Animal Services. Chang learned of the report on January 6, 2022, when investigating officers from the City of Beverly Hills posted a compliance order at his home. A second compliance order was issued on January 13.

When the parties encountered each other, Brooks and his daughter called Chang a "cat killer." Brooks's dog ran towards Margaret. She asked Brooks to leash his dog. Brooks replied by screaming, "English. English. English." Brooks's daughter called the dog back. As the Changs walked away from Brooks, he videotaped them. The video depicts him laughing and asking if the Changs were excited to go to jail. He can be heard saying, "You're going to jail," in a taunting fashion. Chang turned and yelled, " 'Fuck you,' " as he walked away.

After this incident, the Changs called 911 a second time. When the police arrived the evening of November 29, Chang showed them the video of two coyotes attacking a cat. The police said they would show Brooks the video. That same evening, Chang e-mailed the video to the Mulholland Estates' homeowners' association's management company.

The police showed the video to Brooks the same evening. Brooks told the police he had made a mistake. He informed the head of the homeowners' association of the "situation" and admitted he had made a mistake.

On November 30, Brooks contacted Kigonya, told him he had made a mistake, and said he wanted to apologize to Chang. Brooks asked if Chang would allow him to come over to apologize

On January 11 and 18, 2022, Chang filed supplemental declarations to his petition for a restraining order stating that Brooks had reported him to animal services and, as a result, animal services had issued him two compliance orders. However, at the restraining order hearing, the trial court indicated it is "not harassment to call animal control services on someone" and did not rely on any of Brooks's interactions with animal services as a basis for issuing the restraining order.

in person that evening. Kigonya indicated that Chang was not answering his phone and Brooks should wait.

On December 6, Brooks texted Kigonya, explaining that he was leaving town and wanted to apologize to Chang "from the bottom of my heart. . . . I was completely wrong and out of line" and he felt "horrible." At the evidentiary hearing, Brooks explained, "I acted horribly," and "this was . . . horrible, horrible behavior that I exhibited. I was a jerk and I know that. And I said things that I really regret and really wanted to apologize to Mr. Chang . . . directly." On December 7, Kigonya relayed Brooks's apology to Chang via text. The parties did not have any subsequent contact.

On December 8, 2021, Chang filed a request for a civil harassment restraining order seeking protection from Brooks. The court issued a temporary restraining order that same day and set a hearing date for the permanent restraining order.

On January 12, 2022, Brooks filed his response to Chang's request for a restraining order, leaving blank the portion of the form in which he was to indicate whether he owned any firearms. He represented that he primarily lived in Wyoming and was rarely in Los Angeles.

On January 20, 2022, the parties were scheduled for a hearing on the permanent restraining order. However, at Brooks's request, the court continued the hearing to March 15 to allow Brooks to file an anti-SLAPP motion. The court set February 24 as the hearing date for the anticipated anti-SLAPP motion.

On February 2, 2022, Brooks filed the anti-SLAPP motion. Chang filed an opposition that requested attorney fees and costs.

On February 22, 2022, the court denied Brooks's anti-SLAPP motion, finding it was " 'totally and completely without merit' and made in bad faith." The court granted Chang's attorney fees request in an amount to be determined after Chang filed a declaration of fees and costs.

Starting March 15, 2022, the trial court held a four-day evidentiary hearing on the permanent restraining order.[6] On the first day of the hearing, Chang's attorney pointed out that in the response to the temporary restraining order, Brooks had not indicated whether he owned any firearms. Brooks's attorney conceded that Brooks owned firearms, but explained they were at his Wyoming home, so the attorney did not believe disclosure was necessary. The trial court ordered Brooks to relinquish his weapons.

Evidence at the hearing established Brooks's ties to the Los Angeles area. Brooks testified that he was a resident of Wyoming, where he owned a home, he also owned a home in Florida, and he owned the home in Mulholland Estates in Los Angeles, which his daughters sometimes used. He also indicated that his medical license was in California. When the incidents took place, he worked for a company in Santa Monica. At least one of his daughters lived in the Los Angeles area. He testified that since being served with the restraining order, he had returned to Los Angeles for his mother's birthday and a niece's wedding. He had lived in the Mulholland Estates since July

---

[6]    Judge Patricia A. Young presided over the initial hearings and the anti-SLAPP proceedings. The matter was sent to a different bench officer, Judge Michael J. Convey, for the evidentiary hearing on the permanent restraining order and the subsequent proceedings.

2001, and had relationships with people who lived in the community.

On March 24, 2022, the trial court issued a three-year permanent restraining order. The court concluded Brooks displayed impulsive behavior that involved a credible threat of violence and he engaged in a course of conduct that constituted civil harassment. It further found a substantial likelihood of future harm if the parties "confront" each other again, which was possible because Brooks still lived and worked in the Los Angeles area. The court also cited Brooks's initial failure to disclose that he owned firearms and found his reasons for doing so were "less than credible." The court reasoned that Brooks's expressions of regret and apology were mitigating factors that justified a three-year order rather than the potential five years permitted by statute.

On March 29, 2022, the court issued an order awarding Chang $73,405.00 in attorney fees and $1,351.00 in costs on the anti-SLAPP motion.

On April 8, 2022, Brooks filed a timely notice of appeal of the order denying his anti-SLAPP motion, and the subsequent order awarding attorney fees and costs.

On May 6, 2022, Brooks timely appealed from the order imposing the civil harassment restraining order.

On December 20, 2022, Brooks filed a request to terminate the restraining order based on the changed circumstance that he had sold his Los Angeles home. He attached evidence of the sale, recorded November 18, 2022, and a declaration stating he had no intention of living in Los Angeles again, would only be a "short-term visitor" if he returned, and had had no interaction with Chang since the incidents giving rise to the restraining order.

9

On January 23, 2023, following oral argument, the trial court denied Brooks's request to terminate the restraining order. It reasoned that Brooks had moved for termination based on a material change in the facts—that he had sold his home—and it was his burden to prove the restraining order was no longer needed. The court concluded Brooks had not met this burden, citing the court's statement of decision when issuing the restraining order, which had found a substantial likelihood of future harm because Brooks had acted impulsively and there was a substantial likelihood of confrontation if the parties interacted again. The court explained that Brooks had numerous ongoing connections with the area, including family and business interests. Thus, "simply selling the house is insufficient by the preponderance of the evidence test to show that the substantial likelihood of future harm has been removed."

On January 26, 2023, Brooks timely appealed from the denial of his request to terminate the restraining order.

On Brooks's unopposed motion, we consolidated the three appeals challenging the four trial court orders.

## DISCUSSION

### I. Substantial Evidence Supports the Trial Court's Issuance of the Permanent Restraining Order

#### A. Applicable legal principles

Section 527.6 provides that a court may, upon a showing of clear and convincing evidence, issue a restraining order to prevent "harassment." Section 527.6, subdivision (b)(3) defines " '[h]arassment' " as "unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose. The course of

10

conduct must be that which would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner."  Section 527.6, subdivision (b)(2), defines a " '[c]redible threat of violence' " as "a knowing and willful statement or course of conduct that would place a reasonable person in fear for the person's safety or the safety of the person's immediate family, and that serves no legitimate purpose."  " 'Course of conduct' " is defined as "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose." (*Id.*, subd. (b)(1).)

"[A] past act of harassment is insufficient to justify a restraining order." (*E.G. v. M.L.* (2024) 105 Cal.App.5th 688, 706 (*E.G.*).)  The order is an injunction that serves to prevent future injury and is authorized only when there is evidence that the wrongful acts are likely to reoccur.  (*Ibid.*)

"We review the trial court's decision to grant the restraining order for ' "whether the findings (express and implied) that support the trial court's entry of the restraining order are justified by substantial evidence in the record." ' [Citation.]" (*E.G.*, *supra*, 105 Cal.App.5th at pp. 698–699; see also *R.D. v. P.M.* (2011) 202 Cal.App.4th 181, 188 (*R.D.*).)  "[T]he question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.)  We "view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the

11

evidence." (*Id.* at pp. 1011–1012.) "Whether the facts, supported by substantial evidence and construed most favorably in the petitioner's favor, are legally sufficient to constitute civil harassment under section 527.6 is a ' "question[ ] of law subject to de novo review." ' [Citations.]" (*E.G.*, at p. 699.)

## B.     Discussion

Brooks contends substantial evidence did not support the restraining order because there was insufficient evidence of the likelihood of future harassment.  We disagree.

Brooks's behavior towards Chang on November 28 constituted harassment under section 527.6.  He accused Chang of killing his cat; showed up at Chang's property on two occasions; yelled obscenities at Chang; repeatedly threatened him with jail; refused to identify himself but said he knew about Chang, seeking to intimidate Chang; described himself as "Bin Laden," implicitly threatening violence; and lunged towards Chang on two occasions in such an aggressive manner that his daughter felt it necessary to restrain him.

Even when the parties encountered each other on November 29, the day after the cat's death, Brooks ran towards the Changs, recorded them while threatening them with jail, and laughed and taunted them as they walked away.  Brooks also repeatedly yelled "English" at Margaret when she spoke (in English), apparently attempting to demean, belittle, and intimidate her.

This evidence was legally sufficient to constitute civil harassment.  Brooks's actions showed he was quick to anger and confrontational in his words, tone, and physical behavior.  (See *Harris v. Stampolis* (2016) 248 Cal.App.4th 484, 498 ["[P]lacing his hands close to [the victim], raising his voice, pointing and

12

gesturing, and walking back and forth toward her—as a whole constituted a credible threat of violence."].)

However, Brooks argues that there was insufficient evidence that this course of conduct was likely to reoccur once he learned that Chang was not responsible for the cat's death, particularly given his attempts to apologize. " ' "[T]he determination of whether it is reasonably probable an unlawful act will be repeated in the future rests upon the nature of the unlawful violent act evaluated in the light of the relevant surrounding circumstances of its commission and whether precipitating circumstances continue to exist so as to establish the likelihood of future harm." ' [Citations.]" (*E.G.*, *supra*, 105 Cal.App.5th at p. 706.)

While Brooks eventually sought to apologize, he first acted impulsively and belligerently towards Chang without any evidence of Chang's culpability and went out of his way to confront the Chang family, suggesting the possibility of future similar erratic and impetuous behavior. (*R.D.*, *supra*, 202 Cal.App.4th at p. 190 ["history of angry outbursts and erratic behavior" one factor in finding likelihood of future harassment].) At the time of the restraining order hearing, there was evidence that Brooks had a home near the Changs, and family and employment in the Los Angeles area, making future interactions between the parties likely. The trial court also referenced Brooks's failure to disclose that he owned firearms and it found his explanation for the omission less than credible. It reasonably concluded that the evidence established a likelihood of future harassment without a restraining order.

This case is distinguishable from *Scripps Health v. Marin* (1999) 72 Cal.App.4th 324, on which Brooks relies. There, the

13

trial court enjoined Marin, a hospital patient's son, from coming near a Scripps Health facility. The order was based on a single incident in which a facility employee blocked the son from leaving a room, and, when the son nonetheless pulled the door open, it struck the employee and pushed her against a wall. (*Id.* at p. 328.) The Court of Appeal found no likelihood of further acts of violence because there had been only one interaction; the mother had subsequently visited a Scripps Health facility and the son had not made any threats or caused any violence during that visit, despite the lack of a restraining order; and the mother had transferred her health insurance, "rendering it unlikely she would have to return as a patient to a Scripps Health facility." (*Id.* at p. 336.) Here, in contrast, the parties had three interactions in which Brooks harassed the Changs, and it was likely that they would have future interactions.

In sum, substantial evidence supported the civil harassment restraining order.

II. **The Trial Court Did Not Abuse Its Discretion by Denying the Motion to Terminate the Restraining Order**

A. **Applicable legal principles**

Section 527.6, subdivision (j)(1), provides: "In the discretion of the court, an order issued after notice and hearing under this section may have a duration of no more than five years, subject to termination or modification by further order of the court either on written stipulation filed with the court or on the motion of a party." A court's determination of a request to modify or terminate a restraining order is discretionary. (*Yost v. Forestiere* (2020) 51 Cal.App.5th 509, 522–523 (*Yost*).) We therefore review

14

the trial court's ruling for an abuse of discretion. (*Id*. at p. 523; § 527.6, subd. (j)(1).)

Section 527.6 does not specify how a trial court should exercise this discretion. The *Yost* court concluded that the trial court's discretion "includes, *but is not limited to*, the three grounds articulated in section 5[3]3. Those grounds are (1) a material change in the facts, (2) a change in the law, or (3) the ends of justice." (*Yost*, *supra*, 51 Cal.App.5th at p. 526.)

The *Yost* court explained: "[W]hen a trial court, after considering the relevant evidence presented, determines there is no reasonable probability a particular act of harassment will be committed in the future, the court has the discretion to modify the terms of the restraining order addressing that particular act of harassment." (*Yost*, *supra*, 51 Cal.App.5th at p. 528, fn. omitted.) "The evidence relevant to this question of a reasonable probability includes the circumstances surrounding the original threat. [Citation.] In evaluating that evidence, a court considering a modification request must accept the findings underlying the initial issuance of the restraining order where that order has become final." (*Id*. at p. 529.) "[T]he restrained party seeking modification on the ground that there is no longer a reasonable probability of a future harm has the burden of proving this ground by a preponderance of the evidence." (*Id*. at p. 515.)

### B.    Discussion

Brooks contends the trial court abused its discretion when it denied his request to terminate the restraining order after he sold his California home. He asserts this changed circumstance warranted termination of the restraining order because there was

15

no longer a reasonable probability of future harm.  We find no abuse of discretion.[7]

In considering the motion to terminate, the trial court found that Brooks's sale of his Los Angeles home did not remove the likelihood of future harm.  It cited the various bases for its initial issuance of the restraining order other than the proximity of the parties' homes: Brooks's impulsive actions, his personal investigation of the incident, his uninvited entrance onto Chang's property, his threats, his use of profanity and confrontational manner, his reference to himself as "Bin Laden," and his use of a "racist trope."

The court further found that the parties were still sufficiently likely to encounter each other to warrant the need for the order to remain in effect.  It credited Brooks's evidence that he had sold his home and his "assurance that he has no reason to be here."  However, the court also recalled evidence from the original hearing that Brooks still had ties to the Los Angeles area.  One of his daughters lived in the Los Angeles area, California issued his medical license, he was an employee of a

---

[7]	Chang asserts that Brooks's argument is not cognizable on appeal.  He argues that *Malatka v. Helm* (2010) 188 Cal.App.4th 1074, applies here to prevent Brooks from raising the same issue in a subsequent appeal that he could have raised in his appeal from the initial restraining order.  We disagree.  In *Malatka*, the restrained party did not appeal from the initial restraining order but only from the denial of a motion to dissolve or modify it.  (*Id.* at p. 1076.)  Here, Brooks appeals from both orders.  Unlike the restrained party in *Malatka*, Brooks did not attempt to use an appeal from the modification order to assert arguments that should have been raised on direct appeal from the restraining order, but were not.

company in the Los Angeles area, and he had relationships with members of the community where the Changs still lived. The court thus reasonably concluded that the sale of Brooks's Los Angeles home, by itself, did not establish by a preponderance of the evidence that there was no longer a substantial likelihood of future harm.

Brooks argues that the trial court erred in finding that his possession of firearms in Wyoming and his ability to transport them in a private plane suggested he continued to pose a risk of harm to Chang. He points out that he did not use a firearm during the confrontations with Chang, and there was no evidence that he has ever used his aviator's license to transport firearms to California. Brooks also asserts that even if he returned to Los Angeles, Chang lives in a guard-gated community to which Brooks has lost access.

Even accepting these facts as true, we conclude that Brooks has not established that the trial court abused its discretion. The trial court found a likelihood of future harm necessitated the issuance of the restraining order based on numerous factors. The proximity of the parties' homes and Brooks's possession of firearms and ability to transport them were not the only or even the primary factors. The court also relied on Brooks's impulsive and threatening behavior and his continuing ties to the community and the Los Angeles area. Moreover, the period between the issuance of the restraining order in March 2022 and the motion to terminate it in December 2022 was relatively brief, short enough that the trial court reasonably attributed the lack of contact between the parties to the effectiveness of the restraining order.

Brooks also argues that the facts of this case are even less supportive of a finding of the likelihood of future harassment than those in *Russell v. Douvan* (2003) 112 Cal.App.4th 399 (*Russell*). In *Russell*, the trial court indicated it believed that once a petitioner established that there was a battery or assault, it was required to issue an injunction under section 527.6. (*Id*. at p. 401.) The Court of Appeal reversed, concluding the trial court "construed its role too narrowly" when it determined that a single act of unlawful violence mandated the issuance of a restraining order. (*Id*. at p. 404.)

We disagree that *Russell* compels reversal here. In contrast to *Russell*, the trial court here did not erroneously state that it was required to issue the restraining order based on a single act of harassment. The trial court correctly considered the evidence that it was reasonably probable that future harm would occur when it issued the restraining order. As explained above, this finding was supported by substantial evidence. The trial court properly exercised its discretion by then considering whether there had been a material change in the facts, and whether there was still a reasonable probability of future harassment. (*Yost, supra*, 51 Cal.App.5th at p. 526.) The trial court did not abuse its discretion in finding that the sale of Brooks's home alone did not eliminate the possibility of future harassment.

## III. Brooks Has Not Established Reversible Error in Denying the Anti-SLAPP Motion and Awarding Fees and Costs to Chang

Brooks raises five procedural errors regarding the anti-SLAPP order and related award of fees and costs to Chang. None warrants reversal.

18

## A.    Additional background

As noted above, on January 20, 2022, Brooks asked for a continuance of the restraining order hearing so that he could file an anti-SLAPP motion. The parties eventually agreed to a date of February 24 for the anti-SLAPP motion hearing.

On February 2, 2022, Brooks filed the anti-SLAPP motion. He claimed that his alleged acts were made in furtherance of his right to free speech because they were based on his communication with law enforcement and animal services, and Chang could not establish a probability of prevailing on his claims. On February 9, Chang filed an opposition in which he argued (1) his petition for a restraining order did not seek to restrain Brooks from any constitutionally protected activity and therefore Brooks could not establish the first prong of the anti-SLAPP analysis;[8] (2) Brooks's communications to law enforcement and animal services were not privileged; and (3) the petition stated a prima facie case of harassment, so Brooks could not meet the second prong of the anti-SLAPP analysis. He further contended the anti-SLAPP motion was frivolous and

---

[8]    The resolution of a special motion to strike under section 425.16 involves two steps. "Initially, the moving defendant bears the burden of establishing that the challenged allegations or claims 'aris[e] from' protected activity in which the defendant has engaged." (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1061.) A claim arises from protected activity "when that activity underlies or forms the basis for the claim." (*Id.* at p. 1062.) If the defendant carries its burden to demonstrate the plaintiff's claims arise from protected activity, the plaintiff must then demonstrate the claims have minimal merit. (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884.)

requested attorney fees pursuant to section 425.16, subdivision (c)(1).

On February 16, Brooks filed a reply. Regarding Chang's request for attorney fees and costs, he objected to Chang's request on the ground that his anti-SLAPP motion was not frivolous. That same day, he also filed objections to the evidence attached to Chang's opposition. On February 18, Chang filed supplemental declarations to address factual assertions in Brooks's reply brief. On February 22, Brooks filed evidentiary objections to Chang's February 18 declarations, characterizing them as an unauthorized sur-reply.

Although the hearing on the anti-SLAPP motion was scheduled for February 24, on February 22 the court filed its written decision denying the motion, and on February 23 it issued a minute order taking the hearing off calendar.

In its February 22 ruling, the court stated it had considered the parties' briefs, including Brooks's reply brief. The court concluded that Brooks's alleged conduct did not constitute protected activity under the anti-SLAPP statute, thus his motion failed at the first step of the anti-SLAPP analysis. The ruling also acknowledged that both parties filed "several evidentiary objections." However, the court explained that apart from a reporter's transcript from the January 20 hearing,[9] it did not consider *any* evidence because it did not reach the second step of the anti-SLAPP analysis. Accordingly, it denied "[a]ll evidentiary objections" as moot.

---

[9] The January 20 hearing was on Brooks's request for a continuance of the restraining order hearing to allow him time to file an anti-SLAPP motion.

20

The court also found that Brooks's anti-SLAPP motion was " 'totally and completely without merit' " and made in "bad faith." The court therefore awarded Chang attorney fees and costs in an amount to be determined after Chang submitted a declaration detailing the fees and costs he had incurred.

On March 3, Chang filed an attorney declaration regarding the amount of fees and costs. On March 4, Brooks filed an objection to the declaration on the grounds that Chang's attorney was his daughter, and that her billing was "blockbilling" and "vague."

On March 15, Judge Convey, the judge presiding over the restraining order hearing, discussed the further anti-SLAPP proceedings with the parties. He informed the parties that Judge Young, who was considering the request for attorney fees on the anti-SLAPP motion, planned to rule "on the papers submitted" and she would not hold oral argument unless she heard otherwise. Judge Convey informed the parties that any questions should be referred to Judge Young.

In its March 29 award of fees, the court ordered Brooks to pay Chang's counsel $73,405.00 in attorney fees and $1,351.00 in costs. The court expressly considered, among other things, Brooks's March 4 objection to Chang's counsel's declaration. The court found the number of requested hours reasonable but that the hourly rates were high, and it sua sponte reduced the rate in the lodestar calculation.

On April 4, Chang filed a proposed judgment reflecting the award of fees and costs. Brooks filed an objection to that proposed judgment, arguing the court had awarded Chang fees and costs without requiring proper notice under section 128.5, making proper findings, or allowing oral argument. The trial

21

court did not enter the proposed judgment or address Brooks's objections to it.

**B.** **Brooks's opportunity to object to Chang's anti-SLAPP opposition evidence**

Brooks asserts the trial court committed reversible error by denying his anti-SLAPP motion without providing him an opportunity to object to Chang's evidence submitted in opposition to the anti-SLAPP motion.  Although the trial court's written ruling denying the anti-SLAPP motion has a filing date of February 22, 2022, the date next to the trial court's signature reads February 18.  Brooks filed his reply brief and evidentiary objections on February 16.  On February 18, Chang filed supplemental declarations.  On February 22, Brooks filed evidentiary objections to Chang's February 18 declarations.  Brooks therefore contends the court reached a decision without considering the objections Brooks filed on February 22.

The trial court's February 22 ruling explicitly states that the court considered Brooks's reply brief.  As discussed above, it also acknowledges that both parties filed "several evidentiary objections," but it denied "[a]ll evidentiary objections" as moot.  Therefore, the record does not support Brooks's contention that he was denied the opportunity to object to Chang's evidence.  Moreover, even if the court did not consider Brooks's February 22 objections to Chang's February 18 supplemental declarations, Brooks was not prejudiced because the court indicated it did not consider the parties' evidence, which included the February 18 declarations.  Any failure to consider the objections filed after February 18 does not provide a basis for reversal.

## C. Brooks's opportunity to object to Chang's requests for attorney fees and costs

Brooks next asserts that the trial court did not allow him to respond to Chang's request for fees and costs. This argument is also not supported by the record.

First, Brooks had the opportunity to object to Chang's initial request for fees and costs. Chang requested fees and costs in his opposition to Brooks's anti-SLAPP motion. Brooks's reply objected to Chang's request. The court's February 22 order stated that it had reviewed Brooks's reply brief.

Second, Brooks also had the opportunity to object to the amount of fees and costs. On March 3, Chang filed an attorney declaration regarding the amount of fees and costs he had incurred. On March 4, Brooks filed an objection to this declaration. On March 29, the trial court issued its order on the amount of attorney fees and costs.

In sum, Brooks objected to Chang's entitlement to fees and costs in his reply brief and then to the specific amount Chang requested when he filed his opposition to Chang's attorney's declaration. The court stated it had considered both filings.

## D. The trial court's written findings on attorney fees

Brooks further asserts that the trial court's written findings on Chang's requests for attorney fees were not sufficiently "detailed," yet he cites no authority requiring a particular level of detail or otherwise supporting his claim of error.

The initial order awarding attorney fees was explicitly based on the court's finding that the anti-SLAPP motion was " 'totally and completely without merit' " and made in "bad faith."

This is the standard required by statute.  (§ 425.16, subd. (c)(1) [court may award costs and fees under § 128.5 if court finds motion is frivolous or solely intended to cause delay]; § 128.5, subd. (a) [a trial court may award fees as a result of other party's filing made in bad faith].)

The trial court also issued a written order regarding Chang's attorney's hours and rates, in which it sua sponte reduced the amount of requested fees.  This order demonstrated the court's thorough and considered determination of the amount of fees.

Brooks has not established any reversible error based on the level of detail in the court's attorney fee orders.  (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609 [appellant must overcome presumption of correctness by affirmatively showing error and supporting contentions with argument and citations to authority].)

### E.     Notice under section 128.5, subdivision (f)

Brooks argues that the trial court's order awarding Chang attorney fees was invalid because Chang failed to employ the 21-day safe-harbor-notice procedure in section 128.5, subdivision (f)(1)(B), as explained by this court in *Zarate v. McDaniel* (2023) 97 Cal.App.5th 484 (*Zarate*).

After Chang requested fees and costs in his February 9 brief in opposition to the anti-SLAPP motion, Brooks filed a reply brief, but he did not assert that Chang failed to provide him notice or an opportunity to withdraw the motion under section 128.5, subdivision (f).  He also did not raise the issue when he filed his March 4 objection to Chang's attorney's declaration on the requested amount of fees and costs.  Although Brooks referenced section 128.5 in his objection to the proposed

judgment, this belated complaint did not afford the trial court an opportunity to consider the applicability of section 128.5 before making its ruling. " ' "An appellate court will ordinarily not consider procedural defects or erroneous rulings, in connection with relief sought or defenses asserted, where an objection could have been but was not presented to the lower court by some appropriate method . . . ." ' " (*Aljabban v. Fontana Indoor Swap Meet, Inc.* (2020) 54 Cal.App.5th 482, 512.)  Brooks has arguably forfeited this argument.[10]  (*City of Rocklin v. Legacy Family Adventures-Rocklin, LLC* (2022) 86 Cal.App.5th 713, 735 [failure to raise insufficient notice under § 128.5, subd. (f), forfeits claim on appeal]; *Jansen Associates, Inc. v. Codercard, Inc.* (1990) 218 Cal.App.3d 1166, 1170 [failure to raise insufficient notice under § 128.5 waived the argument].)

Brooks contends the issue he raises on appeal is not forfeited because this court's decision in *Zarate* was not issued until 2023, while his appeal was pending.  Although Brooks's argument on appeal hinges on the reasoning in *Zarate*, we disagree that the underlying issue of compliance with section 128.5 was unknown to the parties before the *Zarate* decision.  Indeed, Brooks belatedly and obliquely raised section 128.5 in his April 2022 objection to the proposed judgment, thus indicating his awareness of the issue.  In any event, even considered on the merits, we reject Brooks's argument.

---

[10]  Because the parties did not initially address forfeiture in their briefing, we provided them notice and an opportunity to file supplemental briefs on this issue under Government Code section 68081.

A panel of this division recently summarized the applicable law in *Zarate*:

"Section 425.16, subdivision (c) provides that '[i]f the court finds that a special motion to strike is frivolous or is solely intended to cause unnecessary delay, the court shall award costs and reasonable attorney's fees to a plaintiff prevailing on the motion, pursuant to [s]ection 128.5.' Section 425.16, subdivision (c)'s reference to section 128.5 means a court ' "must use the procedures and apply the substantive standards of section 128.5 in deciding whether to award attorney fees [to a prevailing plaintiff] under the anti-SLAPP statute." ' [Citation.] [¶] . . . [¶] . . . Relevant here, section 128.5, subdivision (f)(1)(B) is a safe harbor provision, which provides that where the challenged action—like a written motion—'can be withdrawn or appropriately corrected,' a motion for sanctions cannot be filed with the court unless the challenged action has not been withdrawn or corrected '21 days after service of the [sanctions] motion or [within] any other period as the court may prescribe.' (§ 128.5, subd. (f)(1)(B).)" (*Zarate, supra*, 97 Cal.App.5th at pp. 488–489.)

Thus, to obtain sanctions under section 128.5, a party typically must first serve a motion for sanctions on the offending party, triggering the 21-day safe harbor period during which the moving party may not file the motion. (*Zarate, supra*, 97 Cal.App.5th at p. 489.) During that time, the offending party may avoid sanctions by withdrawing or correcting the challenged action. If the offending party does not withdraw or correct the challenged action, the moving party may file the sanctions motion. (*Ibid*.)

26

In *Zarate*, we reversed a fee award to plaintiffs who defeated an anti-SLAPP motion because the plaintiffs' attorney fee motions failed to provide the 21-day safe harbor under section 128.5. (*Zarate*, *supra*, 97 Cal.App.5th at p. 486.) The plaintiffs filed a complaint, to which one of the defendants, McDaniel, filed an anti-SLAPP motion in June 2019. In August 2019, plaintiffs opposed the motion, arguing, among other things, that the motion was frivolous.[11] (*Id*. at p. 487.) In September 2019, the court denied the anti-SLAPP motion. (*Ibid*.)

Two months later, in November 2019, the plaintiffs filed motions to recover attorney fees and costs from McDaniel, arguing they were entitled to them under sections 425.16, subdivision (c) and 128.5. (*Zarate*, *supra*, 97 Cal.App.5th at p. 487.) In May 2021, this court affirmed the order denying McDaniel's anti-SLAPP motion. In August 2021, McDaniel opposed the plaintiffs' attorney fees motions, arguing in part that they did not comply with the 21-day safe harbor provision in section 128.5, subdivision (f). (*Ibid*.) In September 2021, plaintiffs filed replies and requested additional fees and costs. (*Id*. at p. 488.) The trial court awarded the plaintiffs attorney fees.

On appeal, this court reversed the trial court order granting the attorney fee motions. We reasoned: "Plaintiffs didn't serve McDaniel with notice of their attorney fees motions until November 2019, . . . about two months after the court denied McDaniel's anti-SLAPP motion, at which point McDaniel could no longer withdraw his motion. Plaintiffs also apparently served McDaniel with notice of their attorney fees motions *after*

---

[11]  There is no indication that they also requested fees and costs in their opposition, as Chang did here.

27

they filed their motions with the court.  Plaintiffs, therefore, failed to comply with the plain terms of section 128.5, subdivision (f)'s safe harbor provision." (*Zarate*, *supra*, 97 Cal.App.5th at pp. 489–490.)  We also observed that, "Courts strictly apply section 128.5, subdivision (f)'s safe harbor provision." (*Id.* at p. 489.)

In contrast, in *Changsha Metro Group Co., Ltd. v. Xufeng* (2020) 57 Cal.App.5th 1 (*Changsha*), the court held that the safe harbor provision in section 128.5, subdivision (f), did not apply to the plaintiff's attorney fee request under section 425.16, subdivision (c).  The court concluded that the Legislature intended for parties seeking sanctions under section 128.5 to comply with its safe harbor provision "as much as possible." (*Id.* at p. 18.)  The court observed that the Legislature intended to create an exception to the safe harbor provision where it would not be practical to comply. (*Id.* at pp. 18–21.)

The *Changsha* court determined it would not have been practical for the plaintiff to comply with the safe harbor provision considering the expedited hearing and briefing schedule that generally applies to anti-SLAPP motions. (*Changsha*, *supra*, 57 Cal.App.5th at pp. 19–23; see also § 425.16, subd. (f) [the hearing on an anti-SLAPP motion must be scheduled "not more than 30 days after the service of the motion unless the docket conditions of the court require a later hearing"].)  It observed that "[o]pposition to an anti-SLAPP motion is due 'at least nine court days . . . before the hearing.' (§ 1005, subd. (b).)" (*Changsha*, at p. 19.)  Thus, "to comply with the 21-day safe harbor notice, a plaintiff would need to draft and serve its section 128.5, subdivision (f) sanctions motion almost immediately after receiving the anti-SLAPP motion due to the 30-day clock that is

running for the hearing date.  Then, the plaintiff would need to draft its opposition to the anti-SLAPP motion while risking that the defendant will withdraw or correct its anti-SLAPP motion during the 21-day safe harbor period.  (§ 128.5, subd. (f)(1)(B).)” (*Ibid.*)

The court also discussed the practical drawbacks of applying for a continuance and other alternatives.  (*Changsha, supra*, 57 Cal.App.5th at pp. 19–21.)  For example, it noted that if a plaintiff did not want to risk the cost of drafting an opposition while the defendant has 21 days to withdraw or correct its motion, it could seek to continue the anti-SLAPP hearing until after the 21-day safe harbor period elapsed.  However, this would “contradict the express purpose of the anti-SLAPP statute, which was designed ‘to establish an efficient screening mechanism for “disposing of SLAPP’s quickly and at minimal expense to taxpayers and litigants.” ’  [Citation.]”  (*Id.* at p. 19.)

In *Zarate,* we indicated that “[w]e disagree with *Changsha* to the extent it holds that section 128.5’s safe harbor provision is never applicable in the anti-SLAPP context.”  (*Zarate, supra*, 97 Cal.App.5th at p. 490, fn. 6.)  However, we found the facts in *Zarate* distinguishable from *Changsha* because “[w]hen McDaniel filed his anti-SLAPP motion on June 18, 2019, the court scheduled a hearing on the motion for early September 2019, or nearly three months after the motion was filed. Accordingly, *plaintiffs had well over a month* to review McDaniel’s motion to ascertain whether it was frivolous or intended to cause unnecessary delay, draft their attorney fees motions, and serve those motions on McDaniel with sufficient time to provide him a 21-day window within which he could have withdrawn that motion before the court ruled on it.  Thus, plaintiffs were not

29

faced with an expedited briefing schedule like the one contemplated in *Changsha*." (*Id*. at p. 490, italics added.) We also observed: "Importantly, plaintiffs don't contend that it would have been impractical for them to provide McDaniel safe harbor notice before filing their attorney fees motions." (*Id*. at p. 491.)

Here, Chang contends it *would* have been impractical for him to file a section 128.5 motion. We agree that Chang did not have a reasonable opportunity to provide 21 days' notice under section 128.5, subdivision (f), during which Brooks could withdraw his motion, before requesting attorney fees. On January 20, at Brooks's request, the trial court scheduled a hearing on Brooks's anti-SLAPP motion for the morning of February 24 and continued the hearing on the restraining order until March 15. Brooks e-mailed his anti-SLAPP motion to Chang on January 31, and it was filed on February 2.[12] Chang filed his opposition and supporting evidence on February 9, also requesting fees and costs based on the frivolous nature of the motion.

To provide 21 days' notice before the February 24 anti-SLAPP hearing, Chang would have been required to serve his section 128.5 motion on February 2, so Brooks could withdraw the anti-SLAPP motion by the end of the day on February 23. This would have required Chang to "draft and serve [the] section 128.5, subdivision (f) sanctions motion almost

---

[12] The motion has a filing date of February 2. Brooks states that it was e-mailed on January 31, pointing to his proof of service with that date. Chang asserts it was e-mailed after hours. Under either date, we would conclude that the safe harbor provision did not apply because, with a hearing on February 24, the motion was considered on an expedited schedule and the reasoning of *Changsha* applies.

immediately after receiving the anti-SLAPP motion due to the [clock that was] running for the hearing date." (*Changsha, supra*, 57 Cal.App.5th at p. 19.) Further, whether the request for sanctions was presented in Chang's opposition to the anti-SLAPP motion or in a separate section 128.5 motion, there was no time for Chang to comply with the 21-day safe harbor provision while also meeting the applicable filing deadlines in advance of the hearing date. (§§ 128.5, subd. (f)(1)(B), 1005, subd. (b) [motions must be filed at least 16 court days before the hearing; opposition due at least nine court days before hearing].)

Moreover, on January 20, Chang agreed to waive his statutory right to a hearing on the permanent restraining order within 25 days from the date the temporary restraining order was issued, continuing the hearing to March 15. (§ 527.6, subd. (g).) The court continued the hearing to allow Brooks to file his anti-SLAPP motion before the court ruled on the permanent restraining order. Any request for a continuance to file a section 128.5, subdivision (f) sanctions motion would not only contradict the express purpose of the anti-SLAPP statute as identified in *Changsha*, but would have further undermined the statutory procedures providing for expeditious resolution of restraining order proceedings.

Given the impracticality of Chang complying with the safe harbor provision in section 128.5, subdivision (f), we find the reasoning of *Changsha* applicable, and not inconsistent with our holding in *Zarate*. We conclude that under the circumstances of this case, Chang was not required to provide notice of his request for attorney fees and costs under the safe harbor provision in section 128.5, subdivision (f).

**F.    Lack of oral argument on the order denying the anti-SLAPP motion and the order setting the amount of fees and costs**

Finally, Brooks contends the trial court erred by ruling on his anti-SLAPP motion, and on the amount of fees and costs, without oral argument.  We conclude that Brooks has not established reversible error.

As to the lack of oral argument prior to the court's order fixing the amount of attorney fees and costs, Brooks waived any claim of error by acquiescing to the trial court deciding the issue without argument.  Brooks had notice that the trial court planned to rule on the amount of fees and costs without oral argument.  As discussed above, Judge Convey specifically advised the parties there would not be oral argument unless requested.  There is no indication that Brooks requested oral argument or otherwise objected to this plan before the court issued its order awarding the amount of fees and costs.  We will not reverse for a procedural defect Brooks could have challenged but did not.

As to the lack of oral argument prior to the court's decision on the anti-SLAPP motion, the record is less clear that Brooks had a meaningful opportunity to object.  However, we need not determine whether the trial court erred in ruling without oral argument because Brooks has not established any prejudice.  On appeal, the reviewing court will not reverse the judgment unless the appellant establishes there was error, and that the error was prejudicial, resulting in a miscarriage of justice.  (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 801; *Grail Semiconductor, Inc. v. Mitsubishi Electric & Electronics USA, Inc.* (2014) 225 Cal.App.4th 786, 799.)  " 'In civil cases, a miscarriage of justice should be declared only when the reviewing court, after an

examination of the entire cause, including the evidence, is of the opinion that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*Grail Semiconductor, Inc.*, at p. 799.)

Aside from the other procedural issues we have discussed, Brooks's only remaining claim of error regarding the anti-SLAPP motion ruling is that the trial court made its decision without oral argument. He fails to contend the trial court's ruling was wrong on the merits. He does not argue that the trial court erred in concluding Chang's restraining order request did not arise from protected activity. He further does not argue that the trial court erred in finding his anti-SLAPP motion frivolous and in bad faith, which entitled Chang to attorney fees. He did not raise section 128.5 in his reply on the anti-SLAPP motion or in his opposition to the attorney fee declaration. To the extent he now argues *Zarate* mandated the result in this case, the opinion was not issued until well after the trial court was divested of jurisdiction by Brooks's filing of an appeal. Brooks does not indicate what he would have argued at a hearing that may have changed the outcome of the anti-SLAPP motion or finding that Chang was entitled to fees, or how his arguments would have supplemented or differed from the information he had already provided the court in his motion and reply. (*Southern California Gas Co. v. Flannery* (2014) 232 Cal.App.4th 477, 492 [appellant failed to establish reversible error when he failed to identify any additional arguments].)

Therefore, even assuming the trial court was required to conduct an oral hearing before ruling on the anti-SLAPP motion, Brooks has not established prejudice warranting reversal. (See *Bravo v. Ismaj* (2002) 99 Cal.App.4th 211, 219, 225–227 [even

where party was entitled to a hearing to declare him a vexatious litigant, there was no prejudice from the failure to hold one]; *Mediterranean Construction Co. v. State Farm Fire & Casualty Co.* (1998) 66 Cal.App.4th 257, 267 [even though there is a right to oral argument on a summary judgment motion, there is no per se rule requiring reversal, and prejudice is "an important element"].)

## DISPOSITION

The trial court orders are affirmed.  Chang is awarded his costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ADAMS, J.

We concur:

EDMON, P. J.

EGERTON, J.

34